**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE LEGAL AID SOCIETY,<br><br>*Plaintiff*,<br><br>v.<br><br>DANIEL F. MARTUSCELLO III, in his official capacity as Commissioner of the New York State Department of Corrections and Community Supervision,<br><br>*Defendant*. | Case No.: 26-cv-08295<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## PRELIMINARY STATEMENT

1. This civil rights action challenges New York's longstanding practice of monitoring prison calls to The Legal Aid Society's ("Legal Aid") legal helplines.

2. For years, Legal Aid has operated two publicly available telephone helplines that provide free legal assistance to incarcerated individuals. Through the helplines, current and prospective Legal Aid clients incarcerated in prisons may call to speak with legal staff to obtain legal advice, referrals, advocacy, and representation at no cost.

3. The helplines receive thousands of calls each year from individuals in prisons operated by Defendant Daniel F. Martuscello III as the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") seeking legal help. Callers contact the helplines about a wide range of issues related to their incarceration, including urgent and time-sensitive issues. Some calls concern the reporting of sexual assault, abuse or brutality by prison staff, or serious medical needs requiring prompt intervention.

4. DOCCS has a policy that subjects phone calls to recording, and it refuses to carve out phone calls made to the helplines.

5. By subjecting the helpline calls to surveillance and recording, DOCCS effectively chills candid communications between incarcerated people and Legal Aid, which in turn impairs Legal Aid's protected legal advocacy and right to associational activity.

6. There are no other practical options that allow Legal Aid to provide immediate assistance to its clients and prospective clients.

7. In-person visits and legal calls must be prearranged and may be difficult to schedule, while legal mail is a slow form of communication.

8. Consistent with its mission, Legal Aid seeks to engage in timely communications with incarcerated individuals seeking legal assistance, free from monitoring by DOCCS. The Constitution gives Legal Aid that right.

9. Legal Aid brings this action under the First Amendment and seeks declaratory and injunctive relief requiring DOCCS to end its practice of monitoring calls to the helplines.

**PARTIES**

10. Plaintiff The Legal Aid Society is a 501(c)(3) nonprofit legal services organization that provides legal assistance, engages in advocacy, and pursues litigation on behalf of people incarcerated across New York state.

11. Legal Aid is headquartered at 199 Water Street, New York, NY 10038.

12. Legal Aid is the oldest and largest legal services organization in the nation, providing quality legal representation to low-income New Yorkers since 1876. It is dedicated to the belief that no New Yorker should be denied access to justice because of poverty. Legal Aid handles approximately 300,000 individual cases and matters annually. It provides legal services to incarcerated individuals primarily through its Prisoners' Rights Project, Incarcerated Client Services Unit, and Criminal Appeals Bureau.

13. As part of its work, Legal Aid operates helplines through which incarcerated persons can seek and receive legal assistance.

14. Defendant Daniel F. Martuscello III is the current Commissioner of DOCCS. He is sued in his official capacity.

15. Defendant Martuscello manages the operations of New York State prisons and is responsible for the policies, practices, and systems governing calls and legal communications incoming to or outgoing from State prisons. He oversees multiple correctional facilities within the Southern District of New York.

**FACTUAL ALLEGATIONS**

16. Legal Aid is a legal services organization serving low-income New Yorkers.

17. In keeping with its mission to provide robust legal services to indigent New Yorkers—including those in prison—Legal Aid established the Prisoners' Rights Project ("PRP"), the Incarcerated Client Services Unit ("ICSU"), and the Criminal Appeals Bureau ("CAB").

18. PRP advocates for people incarcerated in New York City jails and New York State prisons by engaging in direct services, law reform, and civil rights litigation concerning conditions of confinement and issues related to incarceration, including but not limited to physical and sexual abuse, denial of medical care, solitary confinement, and discrimination in prison.

19. ICSU provides legal representation to individuals held in New York City jails with a focus on appeals for disciplinary infractions and classification decisions. ICSU also coordinates intake relating to incarcerated clients' needs and manages the delivery of client services.

20. CAB provides legal services to individuals challenging their criminal convictions on direct appeal and in post-conviction proceedings. Such post-conviction proceedings include hearings before the Parole Board, resentencing proceedings for domestic violence survivors under

the Domestic Violence Survivors Justice Act, Sex Offender Registration Act hearings and appeals, and clemency relief proceedings.

21. Though PRP, ICSU, and CAB make most frequent use of the helplines to talk with current or prospective clients, many other units within Legal Aid also rely on the helplines for the same purposes.

22. To be able to receive immediate assistance from PRP, ICSU, and CAB, incarcerated individuals need to be able to contact them.

**The Legal Helplines**

23. Legal Aid established the helplines to better facilitate the provision of its services to incarcerated populations.

24. The helplines ensure that trained legal staff and incarcerated persons can discuss time-sensitive matters when other methods of contact—prison mail, prearranged legal calls, and in-person visits—are insufficiently prompt to address urgent needs or are unavailable.

25. Trained legal staff answering the helplines include attorneys as well as legal staff working under the supervision of attorneys.

26. The helplines serve a critical purpose: to allow incarcerated persons to seek legal assistance regarding immediate harms they may face within prison, such as imminent violations of their civil rights, dangerous conditions in their environment, and threats of violence from prison staff or other incarcerated persons.

27. Incarcerated persons also call the CAB helpline to ask about the status of their appeals and share information about their cases.

28. By enabling Legal Aid to discuss legal matters in a timely fashion with its clients and prospective clients, the helplines both allow Legal Aid to provide clients with the best possible legal representation and advance its ongoing civil advocacy concerning prisons.

29. Each month, Legal Aid receives hundreds of calls to its helplines from individuals in DOCCS custody on a wide range of sensitive legal issues. These include safety needs, physical and mental health concerns, and their criminal cases, among others.

30. Safety concerns include incarcerated individuals desperately seeking protective custody or a facility transfer based on threats or physical altercations with other incarcerated individuals or staff.

31. Medical issues can include incarcerated individuals needing an appointment for an injury or illness or requiring admission into a Residential Medical Unit.

32. As for mental health matters, incarcerated individuals frequently need help obtaining a re-evaluation of their medication regimen or an assessment for placement into a specialized mental health unit or a discharge from DOCCS custody entirely.

33. For disability accommodations, while incarcerated, people may require an accommodation as a result of a permanent or non-permanent disability that arose during their incarceration.

34. Individuals also make calls to the helplines when actively appealing their criminal convictions, during which they share confidential information and discuss the status of their cases. Clients also involved in Legal Aid's civil litigation will use the helplines to communicate issues related to the litigation.

35. For these urgent and sensitive situations, the helplines are crucial for providing immediate legal assistance.

**DOCCS's Monitoring and Recording of the Helplines**

36. DOCCS maintains a policy and practice of permitting helpline calls to be monitored. A true and correct copy of DOCCS's policy is attached as **Exhibit A.**

37. DOCCS is able to monitor and record calls through its vendor, Securus Technologies LLC.

38. Securus is a company that provides communications systems, call management, and other services to law enforcement agencies and correctional facilities.

39. DOCCS contracts with Securus to manage calls placed by incarcerated persons in DOCCS facilities. A true and correct copy of DOCCS's contract with Securus is attached as **Exhibit B.**

40. Under the contract, DOCCS retains ownership over the calls but grants Securus a limited license to provide the recordings to "law enforcement and correctional officials as they may require for investigative, penological or public safety purposes . . . ." Ex. B, App. C at 40.

41. Based on DOCCS's contract with Securus, Securus is free to provide law enforcement officials with access to the helplines' recordings at its discretion.

42. DOCCS has the ability to list the helplines as private, as it would with other attorney-client calls, but it has not done so.

**DOCCS's Monitoring of the Helplines Results in Delayed or Chilled Speech**

43. DOCCS's ability to monitor and record the helplines significantly hampers Legal Aid in fulfilling its crucial role in advocating for incarcerated people.

44. Calls to the helplines frequently involve urgent and sensitive legal matters that should be confidential.

45. Because DOCCS can record and monitor calls made to the helplines, Legal Aid is forced to defer discussing an individual's pressing concerns unless or until a legal call can be arranged via DOCCS's policy, which can take weeks.

46. By way of example, when an incarcerated individual calls with safety concerns, it is often harmful for legal staff to speak to them on a recorded line, as clients are vulnerable to retaliation from other incarcerated persons as well as DOCCS staff who have the ability to access recorded helpline conversations.

47. This means that even where urgent safety issues are concerned, contact with the client, and legal help, are delayed by at least a week, and sometimes up to three weeks or more due to the wait times for scheduling legal calls and sending and receiving mail.

48. DOCCS's monitoring policy also exposes Legal Aid to harm because Legal Aid is unable to continue privileged attorney-client conversations regarding a client's criminal appeal or ongoing litigation if the incarcerated individuals call the helplines.

49. Some incarcerated persons avoid calling the helplines entirely because the helplines are subject to DOCCS monitoring.

50. In such instances, family members of incarcerated persons may call Legal Aid in place of their incarcerated loved ones. These family members have explained that their loved ones believe that even the perception that they are seeking help could result in retaliation.

51. Other incarcerated individuals make helpline calls and solely ask for confidential legal calls to be arranged without providing any detail about the subject matter of the call because they fear retaliation for seeking legal assistance.

52. Simply put, DOCCS's ability to subject the helplines' calls to monitoring and recording chills Legal Aid's provision of legal services to incarcerated callers.

53. Legal Aid cannot effectively and promptly address client concerns where it or an incarcerated caller is forced to defer a fulsome discussion of legal issues until a confidential call can take place. Legal Aid may be unable to address client concerns at all where incarcerated callers decline to use the helplines entirely.

54. Legal Aid seeks to alleviate the concerns incarcerated persons have raised that calls conducted in full via the helplines may expose incarcerated callers to retaliation.

55. Because the helplines do not guarantee incarcerated callers' confidentiality, Legal Aid cannot fully carry out its mission of advocating for and representing incarcerated people.

56. Accordingly, Defendant's actions interfere with Legal Aid's constitutional rights.

**DOCCS's Alternative Means of Confidential Legal Communications Are an Inadequate Substitute for Time-Sensitive Issues**

57. Given that the helplines are not confidential, Legal Aid's attorneys and staff must resort to communicating with incarcerated clients and prospective clients by scheduling confidential legal calls pursuant to DOCCS's policy, communicating through legal mail, or arranging in-person visits.

58. Under DOCCS's legal call policy, a confidential call must be prearranged for a specific time with a specific attorney and approved by DOCCS personnel. *See* Ex. A.

59. Approval can take days or weeks, and such calls are generally limited to one call within a thirty-day period. These calls can also be cancelled without warning.

60. Outside of legal phone calls, Legal Aid staff can communicate with incarcerated individuals via legal mail.

61. Even at its fastest, processing outgoing legal mail from DOCCS's facilities takes one to three days, and DOCCS does not deliver mail on weekends, state holidays, or federal holidays. *See* N.Y. Comp. Codes R. & Regs. Title 7 § 720.5.

62. DOCCS may also delay incoming correspondence containing printed or photocopied materials for up to six days. *Id.* § 720.4.

63. DOCCS also provides for legal in-person visits. Such visits require, at a minimum, 24-hours' notice to the facility, absent good cause, and further require Legal Aid attorney availability, facility coordination, transportation, and often substantial travel time.

64. Due to the significant hurdles each of these methods of confidential communication raises, only the helplines can assist in providing the immediate legal relief that incarcerated people need.

**Legal Aid Seeks to Resolve Helpline Concerns**

65. Legal Aid attempted to resolve this matter short of litigation.

66. On January 12, 2026, Legal Aid, through its attorneys, sent a letter to Jason Golub, Deputy Commissioner and Counsel for DOCCS.

67. The letter requested that DOCCS discontinue monitoring and recording calls made to the helplines by "whitelisting," or designating the helplines as non-recorded numbers.

68. "Whitelisting" phone numbers is technologically and administratively feasible.

69. Securus and DOCCS are able to, and in fact do, "whitelist" phone numbers.

70. The letter further explained that DOCCS's monitoring and recording policy violates Legal Aid's First Amendment rights.

71. Mr. Golub responded to Legal Aid, and the parties engaged in a series of email exchanges and phone calls to resolve DOCCS's monitoring of the helplines.

72. Ultimately, Mr. Golub indicated that DOCCS refused to whitelist Legal Aid's helplines.

73. In light of DOCCS's refusal to discontinue its monitoring and recording of the helplines, Legal Aid brought this action.

## JURISDICTION AND VENUE

74. Legal Aid brings this action pursuant to 42 U.S.C. § 1983 for violations of its rights under the First Amendment to the United States Constitution, as incorporated against the states by the Fourteenth Amendment.

75. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because the matter in controversy arises under the First Amendment.

76. Legal Aid's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202, respectively; by Rules 57 and 65 of the Federal Rules of Civil Procedure, respectively; and by the general legal and equitable powers of this Court.

77. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2). A substantial number of events giving rise to this action occurred in this District because Defendant operates multiple correctional facilities within this District, many of Legal Aid's current and prospective incarcerated clients reside in those facilities, and Legal Aid is headquartered in this district.

## CLAIM FOR RELIEF

## VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

78. Legal Aid repeats the allegations set forth above in ¶¶ 1 through 77 as if fully set forth herein.

79. Defendant's conduct, as alleged herein, violates Legal Aid's rights under the First Amendment to the U.S. Constitution, as incorporated against the states by the Fourteenth Amendment.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Legal Aid respectfully requests that this Court:

A. Declare that Defendant's monitoring and recording of the helplines violates Legal Aid's rights under the First Amendment to the United States Constitution;

B. Permanently enjoin DOCCS from monitoring and recording helpline calls;

C. Award Legal Aid its reasonable attorney's fees and costs, under 42 U.S.C. § 1988; and

D. Grant any and all further relief that this Court may deem just and proper.

Dated: September 23, 2026

By: ______________________

Heather E. Murray
Daniela del Rosario Wertheimer (*pro hac vice* forthcoming)
CORNELL LAW SCHOOL FIRST AMENDMENT CLINIC[1]
Myron Taylor Hall
Ithaca, New York 14853
Tel: (607) 255-8518
Email: hem58@cornell.edu
Email: ddw83@cornell.edu

Mary Lynne Werlwas
Lauren D. Allen-Yang
Lilianna Rembar
THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT
49 Thomas St., 10th Floor
New York, New York 10013
(212) 577-7941
MLWerlwas@legal-aid.org
lallen-yang@legal-aid.org
lrembar@legal-aid.org

*Counsel for Plaintiff The Legal Aid Society*

[1] Clinic students Jason Blau and Matthew Zucker drafted portions of this complaint. The First Amendment Clinic is housed within Cornell Law School and Cornell University. Nothing in this complaint should be construed to represent the views of these institutions, if any.